**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BARBARA INDIO,<br><br>        Plaintiffs,<br><br>    v.<br><br>WYETH, INC., et al.<br><br>        Defendants. | 1:10-cv-00295-OWW-DLB<br><br>MEMORANDUM DECISION REGARDING MOTION TO STAY (Doc. 34) |

## I. INTRODUCTION.

Barbara Indio ("Plaintiff") brings this action against Wyeth, Inc., Wyeth Pharmaceuticals, Pharmacia & Upjohn Company, LLC, Pharmacia & Upjohn LLC, Pharmacia Corporation, Pfizer, Inc. and various Doe Defendants ("Defendants"). Plaintiff filed a first amended complaint ("FAC") in this court on April 26, 2010. (Doc. 7). Prior to filing the FAC, Plaintiff was severed from multidistrict litigation pending in another district court ("MDL litigation"). *See Aitchson, et al. v. Wyeth Inc., et al.*, Case No. 4:04-cv-01124-WRW (E.D. Ark. January 1, 2010).

Defendants filed a motion to stay the FAC on March 4, 2011. (Doc. 34). Plaintiff filed opposition on April 4, 2011. (Doc. 39). Defendants filed a reply on April 18, 2011. (Doc. 41).
///

**1**

## II. **FACTUAL BACKGROUND**.

In or around 1997, Plaintiff began using hormone replacement therapy drugs ("HRT") to combat normal symptoms of menopause, including a drug manufactured by Defendants known as Prempro. Prempro is prescribed to control symptoms including hot flashes, night sweats, vaginal atrophy, and osteoporosis. Plaintiff alleges that use of Prempro caused her to develop breast cancer.

Prempro was approved for sale in the United States in December, 1994 for use as a combination estrogen and progestin HRT containing 0.625 mg Premarin (conjugated estrogens) and 2.5 mg medroxyprogesterone acetate blister packaged together for concomitant use. Prempro was approved and prescribed as a continuous HRT regime and in 1997 for sale as a single tablet. In 1998, Prempro was approved at an increased progestin dose, in a single tablet containing 0.625 mg Premarin (conjugated estrogens) and 5 mg medroxyprogesterone acetate.

In May 2002, data analysis from clinical trials showed that Prempro caused a 26 percent increase in breast cancer. Based on these findings, the The National Heart, Lung, and Blood Institute ("NHLBI") stopped trials of Prempro on May 31, 2002, and the researchers advised the participants to stop taking Prempro.

Defendants have vigorously promoted their hormone therapy products using marketing efforts directed to physicians and programs intended to reach consumers directly. The intention of Wyeth's marketing efforts was to create a lifelong demand for its hormone therapy drugs and a willingness by physicians to prescribe these drugs to their post-menopausal patients. Defendants' marketing efforts have included overt advertising pieces, such as

print advertisements, videotapes, and brochures directed to consumers, as well as "product placement" efforts in which hormone therapy drugs are favorably positioned in entertainment vehicles or favorably described in the popular press by hired spokespersons. Defendants' pattern of advertising HRT as a lifelong beneficial treatment caused women like Plaintiff and their doctors to look to HRT to solve an array of medical problems that the drugs were never designed for. The risks that came along with HRT drugs were never explained to women or their doctors. Numerous studies have indicated that HRT increases the risk of breast cancer.

The FAC alleges that Defendants recklessly and willfully failed to conduct adequate pre-approval research and post-approval surveillance to establish the safety of the long-term hormone therapy regimen which was the cornerstone of its marketing strategy. Defendants never disclosed on their warning labels that such testing had not been performed, thereby fraudulently inducing physicians and patients alike to use Defendants' HRT products with the false assumption that such drugs had been sufficiently tested.

### III. **LEGAL STANDARD**.

District courts have the inherent power to stay proceedings; this power to stay is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). When considering a motion to stay, the court weighs a series of competing interests: (1) the possible damage which may result from the granting of the stay, (2) the hardship or inequity which a

**3**

party may suffer in being required to go forward, and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay. *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).

When there is an independent proceeding related to a matter before the trial court, the Ninth Circuit has held that a trial court may "find it efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which may bear upon the case." *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983). For a stay to be appropriate it is not required that the issues of such proceedings are necessarily controlling of the action before the court. *Id*. However, a stay may be improper where the independent proceeding is "unlikely to decide, or contribute to the decision of, the factual and legal issues" in the action for which the stay is requested. *Lockyer v. State. of Cal.*, 398 F.3d 1098, 1113 (9th Cir. 2005).

## IV. <u>DISCUSSION</u>.

Defendants seek a stay of all proceedings pending an upcoming Daubert ruling in the MDL litigation. Defendants allege that Plaintiff's breast cancer tested negative for the progesterone receptor ("PR-negative"), and that the MDL court will soon decide a Daubert motion that "may substantially impact the ability of plaintiffs with PR-negative cancer to establish causation." (Motion to Stay at 2). Defendants contend that:

> The HT medications that Plaintiff took are made up of a combination of conjugated equine estrogens and medroxyprogesterone (a synthetic progesterone).

**4**

>Plaintiffs claim that the estrogen and progesterone components in HT increase breast cancer risk by attaching to the estrogen and progesterone receptors that exist on some breast cells. Estrogen and progesterone receptors are proteins that help regulate cell growth. At the time of diagnosis, breast cancer tumors are tested for estrogen and progesterone receptors to determine prognosis and treatment options. A positive test for estrogen and progesterone receptors indicates only the presence of estrogen or progesterone receptors, and does not provide any information about whether those receptors are functioning, or the extent to which, if at all, estrogen and progesterone were attaching to them.
>
>The best available scientific evidence establishes that hormone therapy products that contain conjugated equine estrogens, but do not contain any form of progesterone, do not increase the risk of breast cancer. *See In re Prempro Prods. Liab. Litig.*, 738 F. Supp. 2d 887, 891-92, 895 (E.D. Ark. 2010) (excluding expert testimony that Premarin, an estrogen-only hormone therapy, caused breast cancer). Here, Plaintiff's breast cancer tested negative for the presence of progesterone receptors, meaning that only estrogen receptors were present. Here, Plaintiff's breast cancer tested negative for the presence of progesterone receptors, meaning that only estrogen receptors were present. In PR-negative cases, the MDL court will evaluate whether there is reliable scientific evidence to establish that HT is capable of causing PR-negative breast cells to become cancerous, and that HT was the cause, in fact, of the plaintiff's PR-negative breast cancer.

(Id. at 2-3).

Defendants motion must be denied because a factual dispute exists concerning whether Plaintiff's tissue tests were PR-negative; this foundational question must be answered in the affirmative in order for Defendants to prevail on their motion. Plaintiff represents:

>there now seems to be a dispute as to whether Plaintiff's tissue tested negative for the progesterone receptor. While Defendants have retained an expert who opines that her tissue tested PR-negative because her PR levels were very weak, her original pathology testings on both breasts indicate that she is in fact ER positive and PR positive.

(Opposition at 3).¹ Defendants' reply does not contest Plaintiff's assertion that there is a factual dispute regarding Plaintiff's PR-negative status.

Even assuming *arguendo* that Plaintiff's tissue tested PR-negative, Defendants motion does not establish that any of the applicable factors support granting a stay pending the MDL court's resolution of its own evidentiary issues. Plaintiff correctly notes that a stay would impose additional hardship on her by further delaying resolution of her case, which has already been pending for over six years. Defendants do not sufficiently articulate what harm they will be subjected to absent a stay. Defendants contention that the MDL court's ruling will be "instructive" is premature. Daubert motions have yet to be filed in the MDL litigation. It is possible that these motions may not apply in this litigation. For example, to the extent that Defendants' Daubert motion in the MDL litigation is based on a specific attack on the methodology used by the MDL plaintiffs' expert, the MDL court's resolution of such a motion would only be instructive in this case to the extent that Plaintiff intends to offer evidence grounded in similar methodology or science. There is no basis for such a finding at this time. Defendants motion to stay is DENIED, without prejudice.²

///

---

[1] Neither party's brief cites evidence in support of their conflicting assertions regarding Plaintiff's PR-negative status. In any event, it was incumbent on Defendants, the movants, to establish that Plaintiff's tissue tested PR-negative as a threshold issue.

[2] Numerous district courts have summarily denied Defendants' similar motions to stay other cases remanded from the MDL litigation.

1  IT IS SO ORDERED.

2  **Dated:   April 25, 2011**                             **/s/ Oliver W. Wanger**
                                                           UNITED STATES DISTRICT JUDGE